IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ARJN #3, d/b/a JONATHAN'S GRILLE, et al. | ) ) | |
| | ) | NO. 3:20-cv-00808 |
| Plaintiffs, | ) ) | |
| | ) | JUDGE RICHARDSON |
| v. | ) | |
| | ) | |
| JOHN COOPER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is Defendants' Motion to Dismiss (Doc. No. 42, "Motion"), supported by a Memorandum of Law (Doc. No. 43). Plaintiffs filed a response in opposition, (Doc. No. 49), and Defendants replied (Doc. No. 50). For the reasons set forth below, Defendants' Motion will be GRANTED.

## BACKGROUND[1]

In response to COVID-19 pandemic, Defendants issued numerous orders in attempting to "flatten the curve." (Doc. No. 38 at ¶ 2).[2] On March 15, 2020, the Nashville Davidson County Metropolitan Board of Health held a special public meeting and voted to issue a Declaration of

---

[1] The cited facts are either (1) alleged in the Complaint and accepted as true for purposes of the instant motion to dismiss; or (2) publicly available records that the Court takes judicial notice of. *See Roane Cty., Tennessee v. Jacobs Eng'g Grp., Inc.*, No. 3:19-CV-206-TAV-HBG, 2020 WL 2025613, at *3 (E.D. Tenn. Apr. 27, 2020) ("the Court may take judicial notice of public records and government documents available from reliable sources on the Internet.").

[2] Readers may recall that at the outset of the pandemic in the United States, the original strategy was a 15-day period to "flatten the curve"—*i.e.*, slow the spread (though not necessarily the eventual total incidence) of COVID-19 so that fewer people were infected at one time, a result intended to lower the risk of health care facilities being overwhelmed with COVID-19 patients. Readers may also discern that some citizens are (rightly or wrongful) frustrated by what has happened since the expiration of that 15-day period, in particular the fact that the 15-day period is now so far in the rearview mirror with no end in sight to particular government-mandated or government-recommended countermeasures.

1

Public Health Emergency related to the ongoing COVID-19 pandemic. (*Id*. at ¶ 3). The declaration directed the Chief Medical Director of Health, Dr. Michael Caldwell, to "act as necessary to maintain and protect the public health" in a manner consistent with the authority derived from state and local law and to limit the operation of businesses licensed to serve food or beverages. (*Id*.). Pursuant to that declaration, Dr. Caldwell issued a series of orders over the following months that placed restrictions on certain businesses, including food service businesses, in an announced effort to limit the spread of COVID-19. (*Id*. at ¶¶ 4-31).

Dr. Caldwell issued the first of these orders on March 17, 2020. This initial order ("Order 1") limited bars and restaurants to operating at fifty percent (50%) capacity and also limited bars within restaurants to ten percent (10%) capacity. (*Id*. at ¶ 4). On March 20, 2020, Dr. Caldwell issued an amended Order 1, ("Order 1A") which prohibited restaurants from offering dine-in services, thereby relegating restaurants to sustain their businesses based on take-out orders only. (*Id*. at ¶ 6). On that same day, Dr. Caldwell issued Order 2, which suspended operations of gyms and fitness facilities. (*Id*.).[3]

On April 23, 2020, Defendant Cooper released the "Roadmap to Reopen Nashville" that implemented a four-phase plan to reduce the restrictions on businesses in the event certain metrics were met. (*Id*. at ¶ 9). On May 8, 2020, Dr. Caldwell issued Order 5, which encompassed Phase 1 of the reopening plan and allowed restaurants to open at fifty percent capacity but required bar areas within restaurants to remain closed. (*Id*. at ¶ 13). On May 22, 2020, Defendant Caldwell issued Order 6, which encompassed Phase 2 of the reopening plan and allowed restaurants to operate at a seventy-five percent capacity but required bar areas within restaurants to still remain

---

[3] The Court will not discuss every health order issued by Defendants. However, the health orders not discussed by the Court in this section either did not pertain to restaurants, or simply extended restrictions that were already in place through prior orders.

closed. (*Id*. at ¶ 14). Order 6 allowed businesses such as gyms to open at fifty percent capacity. (*Id*.).

On May 30, 2020, Nashville civil rights activists and others held an "I Will Breathe Rally" in response to the death of George Floyd at the legislative plaza in downtown Nashville. (*Id*. at ¶ 16). During the rally, thousands of protestors marched condemning police brutality and calling for change. (*Id*.). That same day, Defendant Cooper released a public statement urging individuals to attend the "I Will Breathe Rally" with no mention of concerns of spreading COVID-19. (*Id*. at ¶ 17).

On June 22, 2020, Dr. Caldwell issued Order 7, which encompassed Phase 3 of the reopening plan and allowed restaurants to operate at seventy-five percent capacity and allowed bar areas within restaurants to open at fifty percent capacity. (*Id*. at ¶ 18). On July 2, 2020, Dr. Caldwell issued Order 9, which reverted back to Phase 2 of the reopening plan with modifications. (*Id*. at ¶ 21). Order 9 required any food service business with more alcohol sales than food sales, defined as a Limited Service Restaurant ("LSR(s)") by Tenn. Code Ann. § 57-4-102(22), to close completely. (*Id*.). Additionally, Order 9 required any food services businesses that did not have more alcohol than food sales, defined as a Full-Service Restaurant ("FSR(s)") by Tenn. Code Ann. § 68-14-703(9), to revert back to a maximum operating capacity of fifty percent capacity. (*Id*.). Just two days later on July 4, 2020, the Black Lives Matter organization hosted a rally at Bicentennial Mall State Park which brought over 10,000 people to the downtown area. (*Id*. at ¶ 23).

On July 17, 2020, Dr. Caldwell issued Amendment 1 to Order 9, which extended the closure of LSRs. (*Id*. at ¶ 24). On July 23, 2020, Dr. Caldwell issued Amendment 2 to Order 9,

which required FSRs to close at 10:00 p.m.; however, Amendment 2 did not require businesses such as gyms to close at a particular time. (*Id*. at ¶ 25).

On August 16, 2020, Dr. Caldwell issued Order 11, which required LSRs to operate at the lesser of 50 percent maximum capacity or 25 patrons on the premises (and subject to social-distancing requirements). (*Id*. at ¶ 28). Order 11 also required FSRs, like Plaintiffs, to operate at the lesser of 50% capacity or 100 patrons per floor (and subject to social-distancing requirements) and a maximum of six people per table. (*Id*.).

On September 30, 2020, Dr. Caldwell issued Order 12, which continued to limit capacity of FSRs to fifty percent, but extended the required closing time until 11:00 p.m. (*Id*. at ¶ 31). Order 12 also allowed gyms to operate at fifty percent capacity with no particular closing time required. (*Id*.). Order 12 as originally issued will be referred to below as simply "Order 12," as distinguished from any amended and restated version of Order 12.

The Court will take judicial notice of the following health orders that were issued after the filing of the Amended Complaint. On November 2, 2020, Amended and Restated Order 12 went into effect and limited the capacity of FSRs to 100 patrons per floor and 100 patrons outdoors.[4] On November 20, 2020, Dr. Caldwell issued the Second Amended and Restated Order 12, which included the same restrictions on FSRs did as the First Amended and Restated Order 12.[5] On November 30, 2020, Dr. Caldwell issued Third Amended and Restated Order 12, which again limited the capacity of FSRs to 100 patrons per floor and 100 patrons outside but also prescribed that the number of patrons on the premises shall not exceed 5fifty percent of the maximum

---

[4] Amended and Restated Order 12, Nashville.gov, https://www.asafenashville.org/wp-content/uploads/2020/11/Amended-and-Restated-Order-12-FINAL-SIGNED-30-Oct-20FINAL.pdf.

[5] Second Amended and Restated Order 12, Nashville.gov, https://www.asafenashville.org/wp-content/uploads/2020/11/Second-Amended-and-Restated-Order-12-FINAL-SIGNED-20-Nov-20.pdf

4

capacity.[6] On December 14, 2020, Dr. Gill Wright, acting as Interim Chief Medical Director of Health,[7] issued the Fourth Amended and Restated Order 12, which included the same restrictions on FSRs as did the Third Amended and Restated Order 12.[8] On December 31, 2020, Dr. Wright issued the Fifth Amended and Restated Order 12, which included the same restriction on the capacity of FSRs (100 patrons per floor and 100 patrons outside) and also prescribed that the number of patrons on the premises shall not exceed fifty percent of the maximum capacity.[9] On February 1, 2021, Dr. Wright issued the Sixth Amended and Restated Order 12, which included the same restrictions regarding capacity but extended the closing time of FSRs that serve alcohol until 12:00 a.m.[10] FSRs that do serve alcohol are not required to close at a certain time. The Sixth Amended and Restated Order 12 is the health order that is currently in effect as of the date of the issuance of this Opinion.

On September 18, 2020, Plaintiffs ARJN#3, LLC d/b/a/ Jonathan's Grille and Jonathan's Grille-Green Hills, LLC d/b/a Jonathan's Grille filed suit against Defendants John Cooper, Dr. Michael Caldwell, Leslie Waller (in their official capacity), and the Health Department for Metropolitan Nashville-Davidson County. (Doc. No. 1). On October 29, 2020, Plaintiffs filed the Amended Complaint, which asserts that Defendants' Health Director Orders ("Orders") place severe restrictions on bars and restaurants that are in violation of Plaintiffs' rights protected by the

---

[6] Third Amended and Restated Order 12, Nashville.gov, https://www.asafenashville.org/wp-content/uploads/2020/11/Third-Amended-and-Restated-Order-12-FINAL-SIGNED-25-Nov-20.pdf

[7] By virtue of assuming this position, Dr. Wright has been substituted in place of Dr. Caldwell as a defendant (in his official capacity only).

[8] Fourth Amended and Restated Order 12, Nashville.gov, https://www.asafenashville.org/wp-content/uploads/2020/12/Fouth-Amended-and-Restated-Order-12-FINAL-SIGNED-13-Dec.-20.pdf

[9] Fifth Amended and Restated Order 12, Nashville.gov, https://www.asafenashville.org/wp-content/uploads/2020/12/Fifth-Amended-and-Restated-Order-12-FINAL-SIGNED-30-Dec-20-1.pdf

[10] Sixth Amended and Restated Order 12, Nashville.gov, https://www.nashville.gov/Metro-Clerk/Legal-Resources/Emergency-Health-Orders/Order-12f.aspx

United States Constitution and the Tennessee Constitution. Specifically, Plaintiffs assert that the restaurant curfew and occupancy restrictions encompassed within Order 12 violate Plaintiffs' right to equal protection under the law and substantive due process rights as guaranteed by the United States Constitution and the Tennessee Constitution. (*Id*. at ¶ 34). Plaintiffs seek declaratory relief in the form of a declaration that the curfew and occupancy restrictions set forth in Order 12 are in violation of Plaintiffs' above-mentioned constitutional rights, and injunctive relief enjoining Defendants from enforcing the curfew and occupancy restrictions set forth in Order 12.

On November 12, 2020, Defendants filed the instant Motion to Dismiss. (Doc. No. 42). Plaintiffs responded on November 26, 2020, (Doc. No. 49), and Defendants filed a reply on December 3, 2020 (Doc. No. 50). Thus, the Motion is ripe for adjudication.

## LEGAL STANDARD

For purposes of a motion to dismiss brought pursuant to Rule 12(b)(6), the Court must view all the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss brought pursuant to Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*. at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010); *Abriq v. Hall*, 295 F.

6

Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief, even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. Identifying and setting aside such allegations is crucial, because the allegations simply do not count toward the plaintiff's goal of showing plausibility of entitlement to relief. As suggested above, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id*. at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

In reviewing a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*, 552 F.3d 430, 433 (6th Cir.2008). That is not to say that the movant has some evidentiary burden; as should be clear from the discussion above, evidence (as opposed to allegations as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of explanation; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

## ANALYSIS

In their Motion, Defendants raise three arguments for dismissal of the Amended Complaint: (1) Plaintiffs' requests for declaratory judgment and injunctive relief are moot; (2) the Supreme Court's standard in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905) governs, and Order 12 should be upheld unless it has "no real of substantial relation" to the goal of protecting public health, which (according to Defendants) is not the case here; and (3) even if examined under "traditional principles of constitutional law" rather than *Jacobson* in particular, Plaintiffs' claims fail to state a claim upon which relief can be granted. The Court will review Defendants' arguments in turn.

### I. Mootness

Defendants argue that Plaintiffs' claims are moot because the Amended Complaint seeks equitable relief as to Order 12—an order that is no longer in effect, having since been replaced by successive orders amending and restating Order 12. (Doc. No. 43 at 7-8). This Court, and numerous other courts, have previously found that challenges to expired (*i.e.*, no longer in effect) public health orders are moot. *See ARJN #3 v. Cooper*, No. 3:20-CV-00808, 2020 WL 5946894, at *2 (M.D. Tenn. Oct. 7, 2020) (Richardson, J.); *see also Maryville Baptist Church, Inc. v. Beshear*, 977 F.3d 561, 566 (6th Cir. 2020); *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020); *South Winds Women's Center, LLC v. Stitt*, 823 F. App'x 677, 680 (10th Cir. 2020); *Cameron v. Beshear*, No. 3:20-CV-00023-GFVT, 2020 WL 2573463, at *3 (E.D. Ky. May 21, 2020).

However, the Supreme Court recently issued an opinion that provides guidance on the issue of mootness and ever-changing COVID-19 public health orders. In *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020), the Supreme Court enjoined an executive order by the New York Governor that placed occupancy limits on attendance at religious services in certain

designated areas ("red and orange zones"). *Id.* at 66-67. In designated "red zones," religious services were limited to 10 people, and in orange zones, services were limited to 25. *Id.* at 66. At the initiation of the litigation, the plaintiffs were classified as orange zones, but during the litigation, the New York Governor reclassified the areas in which the plaintiffs provide religious services from orange to yellow, thereby increasing the occupancy limits. *Id.* at 68. The Supreme Court rejected the defendant's mootness argument because the plaintiffs "remain under a constant threat that the area in question will be reclassified as red or orange." *Id.* The Court explained:

> It is clear that this matter is not moot. *See Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 462, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007); *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). And injunctive relief is still called for because the applicants remain under a constant threat that the area in question will be reclassified as red or orange. *See, e.g., Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 134 S.Ct. 2334, 189 L.Ed.2d 246 (2014). The Governor regularly changes the classification of particular areas without prior notice. If that occurs again, the reclassification will almost certainly bar individuals in the affected area from attending services before judicial relief can be obtained. At most Catholic churches, Mass is celebrated daily, and "Orthodox Jews pray in [Agudath Israel's] synagogues every day." Application in No. 20A90, at 4. Moreover, if reclassification occurs late in a week, as has happened in the past, there may not be time for applicants to seek and obtain relief from this Court before another Sabbath passes. Thirteen days have gone by since the Diocese filed its application, and Agudath Israel's application was filed over a week ago. While we could presumably act more swiftly in the future, there is no guarantee that we could provide relief before another weekend passes. The applicants have made the showing needed to obtain relief, and there is no reason why they should bear the risk of suffering further irreparable harm in the event of another reclassification.

*Id.* at 68-69. In other words, the challenge to restrictions associated with the "orange zone" designation were not moot, despite the current absence of an "orange zone" designation, because such restrictions were capable of being reinstated, which would happen any time the applicable area designation changed back to orange. In short, the challenged to the restrictions were not moot because the restrictions were capable of being repeated.

9

Although the Supreme Court did not use the particular buzzwords, this appears to have been a straightforward application of the "exception to the mootness doctrine [that] exists for cases that are capable of repetition, yet evading review." *Barry v. Lyon*, 834 F.3d 706, 715 (6th Cir. 2016) (citing *Wis. Right to Life, Inc.*, 551 U.S. at 462). "This exception applies if the challenged action is too brief to be litigated fully before it concludes and if 'there is a reasonable expectation that the same complaining party will be subject to the same action again.'" *Wis. Right to Life, Inc.*, 551 U.S. at 462. The party asserting the exception bears the burden of proof. *Lawrence v. Blackwell*, 430 F.3d 368, 371 (6th Cir. 2005). Recurrence of the issue need not be more probable than not; instead, "the controversy must be capable of repetition." *Id.*

Here, although Order 12 is no longer in effect, substantially the same regulations regarding occupancy limits exist in the successive order currently in effect—the Sixth Amended and Restated Order 12. Although the Sixth Amended and Restated Order 12 removed the closing time requirement for restaurants that do not serve alcohol, restaurants that do serve alcohol are required to close by 12:00 a.m. And in the Amended Complaint, it is these specific regulations (*i.e.*, "capacity restrictions and curfews imposed on Plaintiffs' restaurants contained in Order 12") that Plaintiffs challenge. (*See* Doc. No. 38 at 31). Thus, the challenged provisions of Order 12 have been repeated in the most recent order, so the challenged restrictions not only are *capable* of being repeated, they in fact *have* been repeated. Thus, like the challenged provisions in *Roman Catholic Diocese*, the challenged restrictions are capable of repetition yet evading review. *Fed. Election Comm'n*, 551 U.S. at 462. And given the uncertain ebb and flow of the COVID-19 pandemic and resulting restrictions, it is certainly possible than the duration of a restriction like those challenged here could have a duration shorter than the expected duration of federal litigation regarding such restrictions.

Accordingly, the Court finds that Plaintiffs' constitutional challenges are not moot.

## II. The *Jacobson* Standard

Next, Defendants argue that the Supreme Court's standard in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), governs Plaintiffs' constitutional claims and that therefore the Court should review those claims under the more lenient (towards the challenged restriction) *Jacobson* standard. (Doc. No. 43 at 8-11).

In *Jacobson*, the plaintiff challenged Massachusetts's mandatory compulsory smallpox vaccination law. 197 U.S. at 11. The Supreme Court upheld the law, explaining that when a state enacts emergency measures to protect public health, those measures may permissibly restrict individual liberties so long as they have some "real or substantial relation" to the public health crisis and are not "beyond all question, a plain, palpable invasion of rights secured by" the Constitution. *Id*. at 31, 38.

Relying on *Jacobson*, many courts have held that the traditional tiers of constitutional scrutiny do not apply to COVID-19 related restrictions and that courts may overturn state or local public-health measures only if they are arbitrary or a plain and palpable invasion of constitutional rights. *See In re Abbott*, 956 F.3d 696, 784 (5th Cir. 2020) ("The court's power is limited to asking whether the governing authorities have taken action in "an arbitrary, unreasonable manner" or through "arbitrary and oppressive regulations." (quoting *Jacobson*, 197 U.S. at 28, 38)). The Supreme Court itself at one time appeared to apply a more deferential standard to state measures designed to protect public health under *Jacobson*. *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, J., concurring) (explaining that courts should not second-guess public health measures instituted by state elected officials).

Despite *Jacobson,* however, the Supreme Court recently applied strict scrutiny to a state public health order, and Justice Gorsuch advised that courts should not depart from the "traditional legal test associated with the right at issue." *Roman Catholic Diocese*, 141 S. Ct. at 70 (Gorsuch, J. concurring). Justice Gorsuch explained:

> Although *Jacobson* pre-dated the modern tiers of scrutiny, this Court essentially applied rational basis review to Henning Jacobson's challenge to a state law that, in light of an ongoing smallpox pandemic, required individuals to take a vaccine, pay a $5 fine, or establish that they qualified for an exemption. *Id.*, at 25, 25 S.Ct. 358 (asking whether the State's scheme was "reasonable"); *id.*, at 27, 25 S.Ct. 358 (same); *id.*, at 28, 25 S.Ct. 358 (same). Rational basis review is the test this Court normally applies to Fourteenth Amendment challenges, so long as they do not involve suspect classifications based on race or some other ground, or a claim of fundamental right. Put differently, *Jacobson* didn't seek to depart from normal legal rules during a pandemic, and it supplies no precedent for doing so. Instead, *Jacobson* applied what would become the traditional legal test associated with the right at issue—exactly what the Court does today.

*Id.* at 70.

Thus, *Roman Catholic Diocese* advises courts to use the "traditional legal test associated with the right at issue" when determining constitutional challenges raised during the COVID-19 pandemic. *See Agudath Israel of Am. v. Cuomo*, No. 20-3572, 2020 WL 7691715, at *9 (2d Cir. Dec. 28, 2020) (explaining that after the Supreme Court's decision in Roman Catholic Diocese, the Second Circuit's own prior reliance on *Jacobson* was "misplaced"); *Heights Apartments, LLC v. Walz*, --- F. Supp. 3d ---, 2020 WL 7828818, at *10 (D. Minn. Dec. 31, 2020) (noting that *Roman Catholic Diocese* demonstrated "a perceived shift in courts' treatment of *Jacobson*"). Nevertheless,

> Traditional constitutional review still will be relatively deferential to the government in most circumstances involving a crisis of this sort. Whether it is deemed an "emergency" or not, responding to a public-health threat is undeniably a compelling government interest. *Jacobson*, 197 U.S. at 25, 25 S.Ct. 358; *Denver Bible Church* [*v. Azar*], [---F. Supp. 3d]---,]2020 WL 6128994, at *6, *8 [(D. Colo. Oct. 15, 2020)]. Emergency measures subject to rational-basis review will generally be upheld.

*Lawrence v. Polis*, No. 120CV00862DDDSKC, 2020 WL 7348210, at *5 (D. Colo. Dec. 4, 2020). That is not to say that the right impacted by the emergency measures always are of a character that merits only rational-basis, rather than a stricter, standard of review; if the right is entitled to more protection, then a stricter standard of review will be applied accordingly. But it is to say that if the right involved generally (*i.e.*, without considering *Jacobsen*) would merit only rational basis review, then the court should apply rational basis review—which is essentially what *Jacobson* did, albeit under a slightly different verbal formulation.

In light of *Roman Catholic Diocese*, the Court will apply the traditional constitutional test when evaluating Plaintiffs' claims involving their equal protection and due process rights. However, this decision will not be of much consequence in this case, because as the Court explains below, rational basis review applies to Plaintiffs' claims. And as the Supreme Court has explained, in *Jacobson* the "Court essentially applied rational basis." *Roman Catholic Diocese*, 141 S. Ct. at 70. With or without *Jacobson*, given Plaintiffs' particular rights involved, rational-basis review is applicable. Thus, the Court's decision not to apply *Jacobson* is not outcome determinative of Defendants' Motion.

### III. Rule 12(b)(6) Review

Now that the Court has established that "traditional constitutional review" will apply to Plaintiffs' claims, the Court proceeds to Defendants' argument that Plaintiffs' claims should be dismissed pursuant to Rule 12(b)(6). Specifically, Defendants argue that Plaintiffs fail to state a claim because (1) "Plaintiffs have no fundamental right at issue in this case"; (2) "Order 12 and Amended and Restated Order 12 easily satisfy rational basis review"; and (3) "Plaintiffs offer no plausible allegations of similarly-situated businesses that were treated differently." (Doc. No. 43 at 12). The Court will assess Defendants' arguments below.

13

A. *Substantive Due Process*

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." The Fourteenth Amendment has a substantive due process component and a procedural due process component. *Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996). The substantive due process component "protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action." *Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir. 1988). "When reviewing a substantive due process claim, [a court] must first craft a 'careful description of the asserted right,' *Reno v. Flores*, 507 U.S. 292, 302 [] (1993), and then determine whether that right is 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty,' such that it can be considered a 'fundamental right.'" *Doe v. Michigan Dep't of State Police*, 490 F.3d 491, 500 (6th Cir. 2007) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). "Legislation that infringes on a fundamental right is reviewed under the strict-scrutiny test and will be invalidated unless it is 'narrowly tailored to serve a compelling state interest.'" *Id.* (quoting *Flores*, 507 U.S. at 302). If a fundamental right is not implicated, courts will utilize rational-basis review. *Id.* (citing *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 806 (6th Cir. 2005)). While the Sixth Circuit has recognized that there is a liberty interest in an individual's "freedom to choose and pursue a career, to engage in any of the common occupations of life," *Wilkerson v. Johnson*, 699 F.2d 325, 328 (6th Cir. 1983) (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)), such deprivation constitutes the deprivation of a fundamental right "only where the defendant's action effectively precludes the plaintiff from practicing his trade with all employers or customer's that the plaintiff's liberty." *Jackson v. Heh*, No. 98-4420, 2000 WL 761807, at *6 (6th Cir. June 2, 2000); *Cityspec, Inc. v. Smith*, 617 F. Supp. 2d 161, 169 (E.D.N.Y. 2009) (holding

14

that the right to pursue a chosen occupation "is not absolute," and "it is only when the challenged action effectively prohibits one from engaging in a profession, or pursuing any job in a given field that there is a deprivation entitled to protection").

Here, Plaintiffs do not allege the deprivation of a fundamental right because Plaintiffs do not allege that they are prevented from engaging in their profession. In fact, the allegations make clear that the restaurants are still in operation. (Doc. No. 38 at ¶ 39). And numerous courts, adjudicating substantive due process challenges to government orders instituted to combat COVID-19, have held that there is no fundamental right to pursue a career or run a business. *See 4 Aces Enterprises, LLC v. Edwards*, ---F. Supp. 3d---, 2020 WL 4747660, at *11 (E.D. La. Aug. 17, 2020) (rejecting the plaintiff's argument that it had a fundamental right to run a business for purposes of the substantive due process claim); *Vill. of Orland Park v. Pritzker*, 475 F. Supp. 3d 866, 884 (N.D. Ill. 2020) ("the right to work is not a fundamental right for purposes of the plaintiffs' substantive due process claim"); *Prof'l Beauty Fed'n of California v. Newsom*, No. 2:20-CV-04275-RGK-AS, 2020 WL 3056126, at *8 (C.D. Cal. June 8, 2020) ("The right to work is not a fundamental right; laws affecting the right to work are subject to rational basis review."); *Henry v. DeSantis*, No. 20-CV-80729, 2020 WL 2479447 (S.D. Fla. May 14, 2020) (finding that order closing bars and restaurants did not violate the plaintiff's substantive due process rights because "Time and again, the Supreme Court has determined that there is no fundamental right to a job, or right to work."); *In SH3 Health Consulting, LLC v. Page*, No. 4:20-CV-00605 SRC, 2020 WL 2308444, at *10 (E.D. Mo. May 8, 2020) ("The Eighth Circuit has consistently rejected right-to-conduct-business/right-to-earn-a-living due-process claims.").

The Court finds that Plaintiffs have not alleged a violation of a fundamental right in the context of the substantive due process claim. Therefore, the Court will apply rational-basis review.

*See Stolz v. J & B Steel Erectors, Inc.*, 439 F. Supp. 3d 980, 989 (S.D. Ohio 2020) (explaining that "in the absence of any fundamental right" a due process challenge receives only rational basis review).

"As the Supreme Court often has reiterated, the party challenging [a government action] subject to rational basis review must 'negate every conceivable basis which might support it.'" *Am. Exp. Travel Related Servs. Co. v. Kentucky*, 641 F.3d 685, 690 (6th Cir. 2011) (citing *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). The Sixth Circuit has held that "under rational basis review, . . . a purported rational basis may be based on 'rational speculation unsupported by evidence or empirical data' and need not have a foundation in the record." *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005). "Thus, if a statute can be upheld under any plausible justification offered by the state, or even hypothesized by the court, it survives rational-basis scrutiny." *Am. Exp. Travel Related Servs.*, 641 F.3d at 690 (citation omitted).[11]

"Under rational basis review, official decisions are afforded a strong presumption of validity." *In re Flint Water Cases*, 384 F. Supp. 2d 802, 844 (E.D. Mich. 2019) (citing *Walker v. Bain*, 257 F.3d 660, 668 (6th Cir. 2001)). "And even at the motion to dismiss stage, this presents a formidable bar for plaintiffs to surmount." *Id.* (citing *Theile v. Michigan*, 891 F.3d 240, 243 (6th Cir. 2018)). "To plausibly allege that state action fails under rational basis review, plaintiffs must negate 'every conceivable basis' which might support the challenged conduct." *Id.* (quoting *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012)). "Courts do not consider the wisdom

---

[11] "A plaintiff may demonstrate that governmental action lacks a rational basis in one of two ways: (i) by negating 'every conceivable basis which might support the government action' *or (ii) by 'demonstrat[ing] that the challenged government action was motivated by animus or ill-will.*'" *Sanders v. City of Hodgenville, Kentucky*, 323 F. Supp. 3d 904, 912 (W.D. Ky. 2018) (quoting *Klimik v. Kent Cty. Sheriff's Dep't*, 91 F. App'x 396, 400 (6th Cir. Jan. 30, 2004)). Here, there are no allegations in the Amended Complaint, and no argument from Plaintiffs, that Defendants' actions were motivated by ill-will or animus towards Plaintiffs.

16

of the challenged action[,] and defendants do not need to offer any justification. It is enough that the reviewing court can fairly conceive of one existing." *Id*. (citations omitted); *see also Midkif*, 409 F.3d at 771 (affirming dismissal of equal protection claim, under rational basis review, where the plaintiff's pleadings failed to overcome the presumed validity of the government's policy); *Gilmore v. Cnty. of Douglas, State of Nebraska*, 406 F.3d 935, 937 (8th Cir. 2005) ("[A]ll that must be shown is any reasonably conceivable state of facts that could provide a rational basis for the classification[;] it is not necessary to wait for further factual development in order to conduct a rational basis review on a motion to dismiss.") (internal quotations omitted); *Operation Badlaw, Inc. v. Licking Cnty. Gen. Health Dist. Bd. of Health*, 866 F. Supp. 1059, 1066 (S.D. Ohio 1992) *aff'd*, 991 F.2d 796 (6th Cir. 1993) (explaining that the existence of rational basis is a "legal question [that] is appropriate for decision in the context of a motion to dismiss.").

To support their argument that Order 12's curfew and occupancy restrictions pass constitutional muster on rational-basis review, Defendants submit the declaration of Dr. Caldwell (Doc. No. 15) that had previously been filed to oppose Plaintiffs' request for a temporary restraining order.[12] Defendants point out (as do Plaintiffs in their Amended Complaint) that in his

---

[12] The Court may properly consider Dr. Caldwell's declaration on Defendant's Rule 12(b)(6) motion because the Court may consider information contained in "a document that is not formally incorporated by reference or attached to a complaint" where it "'is referred to in the complaint and is central to the plaintiff's claim.'" *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (quoting 11 James Wm. Moore, et al., Moore's Fed. Practice § 56.30[4] (3d ed. 1998)); *see also Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) ("When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein."); *see also Saddle Rock Partners, Ltd. v. Hiatt*, No. 95-2326 GA, 1996 WL 859986, at *5 (W.D. Tenn. Mar. 26, 1996) ("On a motion to dismiss, the court may consider the entire text of documents from which selected passages are referred to in the complaint without converting the motion into one for summary judgment." (citation omitted)). Here, Plaintiffs' Complaint cites portions of Dr. Caldwell's declaration, a document that was already part of the record in this case. *See Mediacom Se. LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (noting that it would be appropriate to consider, on a 12(b)(6) motion to dismiss, a document attached to a motion to intervene because it appears in the record if it is referred to in the complaint and central to the claims therein). Thus, the Court finds that Dr. Caldwell's declaration is therefore central to Plaintiffs' claims and the Court may properly consider any and all of it as necessary at the motion-to-dismiss stage.

declaration, Dr. Caldwell explained that "large numbers of patrons in close proximity to one another creates an environment conducive to the spread of COVID-19." (Doc. No. 38 at ¶ 66 (citing Doc. No. 15 at ¶ 30)). Dr. Caldwell also stated that contract tracing connected COVID-19 clusters to bars and restaurants. (*Id.* at ¶¶ 57, 66 (citing Doc. No. 15 at ¶¶ 26, 30)). Dr. Caldwell also explained in his declaration that prior to Order 12's implementation, Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases, called for states experiencing a surge in COVID-19 cases to close bars and indoor restaurants or, alternatively, ensure properly distanced seating. (Doc. No. 15 at ¶ 35). These are plausible justifications for the specific restrictions on restaurants located within Order 12. *See Am. Exp. Travel Related Servs.*, 641 F.3d at 690 (citation omitted).

Moreover, the Court takes judicial notice of the language of Order 12, which is a matter of public record. *See Roane Cty., Tennessee*, 2020 WL 2025613, at *3 ("the Court may take judicial notice of public records and government documents available from reliable sources on the Internet."). Order 12, which outlines phase three of Nashville's reopening plan, states that

> Nashville's substantial and sustained effort has reduced our new COVID-19 cases to a lower level than seen through much of the summer. Although the surge in numbers has fallen, epidemiologists and infectious disease experts agree that in the absence of strict social distancing and wearing cloth face coverings or masks, numbers would once again surge. . . .

> Living with COVID-19 means finding ways for our city to return to work with COVID-19 still circulating. The Roadmap for Reopening Nashville (Roadmap) presented a framework for a four-phase reopening reflecting the state of the COVID-19 pandemic in Tennessee and distinctive needs in Nashville. The Roadmap with modifications provides ways for our city to continue to return to work with COVID-19 still circulating.

Health Director Order 12: Phase 3 Reopening, Nashville.gov, available at https://www.nashville.gov/Metro-Clerk/Legal-Resources/Emergency-Health-Orders/Order-12.aspx (last accessed January 14, 2021). Thus, through the above-referenced language Defendants

made clear that Defendants' purported goal in instituting the regulations within Order 12, including the curfew and occupancy restrictions, was to reduce the spread of COVID-19 in Nashville. As the Supreme Court has recognized, "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Roman Cath. Diocese*, 141 S. Ct. at 67. And as explained above, the Court need "not consider the wisdom of the challenged action[,] and defendants do not need to offer any justification. It is enough that the reviewing court can fairly conceive of one existing." *In re Flint Water Cases*, 384 F. Supp. 2d at 844.

Plaintiffs have failed to plausibly rebut Metro's asserted justifications for the regulations contained within Order 12, as required to overcome the presumed validity of Order 12's regulations. *See id.* In fact, Plaintiffs appear to concede that the health orders were issued to slow the spread of COVID-19. In the Amended Complaint, Plaintiffs allege that the Metro Board of Health directed Dr. Caldwell to "act as necessary to maintain and protect the public health," (*id.* at ¶ 3), and "[i]n response to COVID-19, Defendants issued numerous orders in efforts to 'flatten the curve.'" (Doc. No. 38 at ¶ 2).

Nevertheless, Plaintiffs argue that Order 12 is not based on "rational speculation" because the "forty-nine (49) cites where COVID-19 clusters have been linked does not contain either of Plaintiffs restaurants nor any other restaurants." (Doc. No. 49 at 16). Plaintiffs also reference emails between Metro officials that Plaintiffs allege demonstrate "extremely low coronavirus cases emanating from bars and restaurants." (Doc. No. 38 at ¶70). However, the Sixth Circuit instructed that under rational-basis review, the government's action "is not subject to courtroom fact-finding and may be based on rational speculation *unsupported* by evidence or empirical data. [] Especially so, we note, in the case of a public health crisis like the one presented by COVID-19[.]" *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 128 (6th Cir. 2020)

19

(citation and internal quotation marks omitted) (emphasis added). Accordingly, Plaintiffs'
Amended Complaint failed to "'allege facts sufficient to overcome the presumption of rationality
that applies'" to Order 12's curfew and occupancy regulations. *In re City of Detroit*, 841 F.3d 684,
701 (6th Cir. 2016) (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992)).
Therefore, Plaintiffs' substantive due process claim fails as a matter of law.

    B. *Equal Protection*

    The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within
its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state an equal
protection claim, a plaintiff must adequately allege that the government treated the plaintiff
"disparately as compared to similarly situated persons and that such disparate treatment either
burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical
Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quoting *Club Italia Soccer & Sports
Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 299 (6th Cir. 2006)); *see also Silver v.
Franklin Twp. Bd. Of Zoning Appeals*, 966 F. 2d 1031, 1036 (6th Cir. 1992) ("The basis of any
equal protection claim is that the state has treated similarly-situated individuals differently."). 
Because no fundamental right or suspect class is involved in this case, rational-basis review
applies. *Ondo v. City of Cleveland*, 795 F.3d 597, 608 (6th Cir. 2015).[13]

---

[13] Rational-basis review applies to Plaintiffs' equal protection claim because the alleged disparate treatment
does not burden a fundamental right or target a suspect class. In the Amended Complaint, Plaintiffs allege that
"Plaintiffs have a fundamental right under the U.S. Constitution and its Amendments, to pursue any common
occupation of life, including owning and operating a restaurant[.]" (Doc. No. 38 at ¶ 102). Of course, this is a legal
conclusion that need not be taken as true at the motion-to-dismiss stage. As Defendants point out, the Sixth Circuit
has clearly stated that pursing one's chosen profession does not implication a fundamental right for purposes of the
equal protection clause. *Whittle v. United States*, 7 F.3d 1259, 1262 (6th Cir. 2003) ("There is no basis in law for the
argument that the right to pursue one's chosen profession is a fundamental right for the purpose of invoking strict
scrutiny under the Equal Protection clause."); *see also Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 537
(E.D.N.C. 2020) (noting, in analyzing the plaintiff's equal protection claim, that "the regulation of business operations
does not "impinge on fundamental rights." (citing *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 426 & n.5 (2010))).
Additionally, Plaintiffs appear to concede that the right to pursue one's chosen profession is not deemed fundamental
in the equal protection context, basing its equal protection argument instead on the theory that "Defendants are treating
similarly situated businesses differently without a rational basis to justify that disparate treatment." (Doc. No. 49 at

In the Amended Complaint, Plaintiffs allege that "Defendants have applied Restrictions in a discriminatory manner because they have enforced Restrictions on restaurants, partially enforced Restrictions on gyms, and not enforced Restrictions on protestors." (Doc. No. 38 at ¶ 86). Defendants argue that Plaintiffs' equal protection claim fails because Plaintiffs have not alleged that similarly situated businesses were treated differently. (Doc. No. 43 at 16). Defendants contend that Plaintiffs have not alleged any facts that "demonstrate these [other kinds of] businesses (or protests) are similarly situated to restaurants, which seat customers in close proximity at tables, which cannot practically require masks during eating or drinking, and in which food and drink are exchanged between staff and customers." (Doc. No. 43 at 16).

The Court finds that even if Plaintiffs had plausibly alleged that restaurants were similarly situated to gyms and protests (which it does not find), Plaintiffs' equal protection claim would still fail because the Amended Complaint does not rebut a rational basis for the distinction in treatment of restaurants and gyms/protests. The Amended Complaint cites Dr. Caldwell's criteria for determining the restrictions in health orders:

> (1) Indoor vs. Outdoor—spread is much more likely in an indoor setting; (2) Masks vs. No Masks—spread is much more likely in an environment where masks are not being worn; (3) Social Distancing vs. No Social Distancing—spread is much more likely in environments where social distancing is not possible or is not being observed; and (4) Alcohol vs. No Alcohol—spread is much more likely in settings where alcohol is being consumed than otherwise, likely due to the fact that consumption of alcohol necessarily occurs without a mask covering being utilized and, equally importantly, that the consumption of alcohol often lowers inhibitions and makes it less likely for citizens to comply with social distancing guidelines.

19). Accordingly, because "no suspect class or fundamental right is implicated, the Court must apply rational basis review." *Wagner v. Haslam*, 112 F. Supp. 3d 673, 691 (M.D. Tenn. 2015) (quoting *Midkiff*, 409 F.3d at 770).

Additionally, although there is no allegation present that Plaintiffs are a member of a suspect class, the Court notes that Plaintiffs do not belong to a suspect or quasi-suspect class. *C.f. Loving v. Virginia*, 388 U.S. 1, 11 (1967) (race is a suspect class); *Oyama v. California*, 332 U.S. 633, 646 (1948) (national origin is a suspect class); *Graham v. Richardson*, 403 U.S. 365, 376 (1971) (alienage is a suspect class); *Craig v. Boren*, 429 U.S. 190, 197 (1976) (gender is a quasi-suspect class); *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (illegitimacy is a quasi-suspect class).

(Doc. No. 38 at ¶ 68 (citing Doc. No. 15 at ¶ 36)).

Based on this criterion, the Court can conceive a rational justification for treating restaurants, where patrons are seated unmasked in close proximity, differently from protests, which occur outside and allow for mask wearing, and gyms, where patrons are better able to practice social distancing and do not serve alcohol. *See Michigan Rest. & Lodging Ass'n v. Gordon*, No. 1:20-CV-1104, 2020 WL 7053230, at *2 (W.D. Mich. Dec. 2, 2020) (finding that Michigan's restrictions treating gyms and restaurants differently passed rational-basis review because "the Court finds that a plausible explanation for the emergency order exists: Restaurant patrons cannot wear a mask while eating or drinking."); *see also Am. Exp. Travel Related Servs.*, 641 F.3d at 690 ("Thus, if a statute can be upheld under any plausible justification offered by the state, *or even hypothesized by the court*, it survives rational-basis scrutiny." (emphasis added)). Thus, because Plaintiffs' Amended Complaint fails to negate every conceivable basis that may support the distinction in treatment between restaurants and protests/gyms, Order 12's curfew restrictions and occupancy limits that apply to bars and restaurants survive rational-basis review. Therefore, Plaintiffs' equal protection claim fails as a matter of law and will be dismissed.

C. *Tennessee Constitution*

In the Amended Complaint, Plaintiffs allege that Order 12's curfew and occupancy restrictions violate Plaintiffs' due process rights and Plaintiffs' right to equal protection under the Tennessee Constitution. (Doc. No. 38 at ¶¶ 123-28). Defendants move to dismiss these claims, arguing (in part) that Plaintiffs' Tennessee constitutional claims fail for the same reasons as do Plaintiffs' federal constitutional claims because the Tennessee Constitution confers essentially the same equal protection and due process protections as the United States Constitution. (Doc. No. 43 at 18).

Plaintiffs failed to respond to Defendants' argument. Therefore, in Defendants' Reply, they argue that Plaintiffs have abandoned their Tennessee constitutional law claims. The Court agrees. By failing to respond to Defendants' argument regarding Plaintiffs' Tennessee constitutional claims, Plaintiffs have indeed abandoned their claims. *See PNC Bank, Nat. Ass'n v. Goyette Mech. Co., Inc.*, 88 F. Supp. 3d 775, 785 (E.D. Mich. 2015) (dismissing claims that the plaintiffs failed to respond to in opposition to motion to dismiss, noting that "[a] plaintiff abandons undefended claims."). Where a party fails to respond to an argument in a motion to dismiss "the Court assumes he concedes this point and abandons the claim." *Id.* (quoting *Mekani v. Homecomings Fin., LLC*, 752 F. Supp. 2d 785, 797 (E.D. Mich. 2010)); *see also Doe v. Bredesen*, 507 F.3d 998, 1007-08 (6th Cir. 2007) (affirming the district court's conclusion that the plaintiff abandoned certain claims by failing to raise them in his brief opposing the government's motion to dismiss). Accordingly, Plaintiffs' claims brought pursuant to the Tennessee Constitution will be dismissed.

**IV. Plaintiffs' Previously Stayed Claims**

In a prior Order, the Court stayed, pursuant to the *Younger* abstention doctrine, Plaintiffs' "claims related to the issuance and prosecution of the citations and civil warrant, subject to any party's prerogative to move to lift the stay on the ground that court proceedings have been finally concluded with respect to the two citations and the civil warrant." (Doc. No. 24 at 9-10).

"A district court deciding to abstain under *Younger* has the option of either dismissing the case without prejudice or holding the case in abeyance." *Eidson v. State of Tennessee Dep't of Children's Servs.*, 510 F.3d 631, 638 (6th Cir. 2007). Because the Court will grant Defendants' Motion to Dismiss and dismiss Plaintiffs' remaining claims, the Court will lift the stay and dismiss Plaintiffs' stayed claims *without* prejudice.

## CONCLUSION

It is, at best, cold comfort for Plaintiffs to hear that the Court sympathizes with them for their plight. The Court does not deny the difficulties that restaurants have faced during the pandemic. Nor does it deny the role that small to mid-sized businesses have played in keeping the U.S. economy afloat during the pandemic (and, for that matter, at all other times).

Furthermore, the Court does not begrudge Plaintiffs believing that the substance and/or enforcement of Defendants' orders is bad policy, unfairly slanted in favor of or against various constituencies, and ultimately not supported by sound science. The Court understands Plaintiffs' apparent frustration in this regard. The Court takes no position on these beliefs, however, because it need not do so, and indeed so doing is beyond its role. Also beyond the Court's role is telling the Metropolitan Government of Nashville and Davidson County how, within constitutional boundaries, to respond to the threat of COVID-19. Justice Kavanaugh's observation in a case last year, in granting a point to the majority from which he was dissenting, is clearly correct: "Under the Constitution, state and local governments, not the federal courts, have the primary responsibility for addressing COVID–19 matters such as quarantine requirements, testing plans, mask mandates, phased reopenings, school closures, sports rules, adjustment of voting and election procedures, state court and correctional institution practices, and the like." *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2614 (2020) (Kavanaugh, J., dissenting from denial of application for injunctive relief).

The Court's proper role is constrained to deciding whether Plaintiffs have adequately stated claims upon which relief can be granted. Here, that means deciding whether Plaintiffs have set forth factual content plausibly suggesting that the restrictions in question (irrespective of whether they are ultimately wrongheaded) are violative of the U.S. and Tennessee Constitution in the

24

manner alleged. Given the standards applicable to Plaintiffs' particular challenges, which are quite lenient towards Defendants here, the Court answers that question in the negative for the above-stated reasons.

Accordingly, Defendants' Motion to Dismiss (Doc. No. 42) will be **GRANTED** and Plaintiffs' claims will be dismissed. An appropriate order will be entered.


_Eli Richardson_
ELI  RICHARDSON
UNITED STATES DISTRICT JUDGE